IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 29, 2023

**STATE OF TENNESSEE v. KIM OWEN ALLEY**

**Appeal from the Criminal Court for Hawkins County**
**No. CC-18-CR-79   Alex E. Pearson, Judge**

_____

**No. E2022-01523-CCA-R3-CD**

_____

The Hawkins County Grand Jury charged the Defendant, Kim Owen Alley,[1] by presentment with one count of theft of $60,000 or more but less than $250,000, one count of transacting business as an unregistered broker-dealer, and one count of fraudulent acts or devices. A few months later, another presentment was issued charging the Defendant with two additional charges: one count of money laundering and one count of theft of $2,500 or more but less than $10,000.[2] Prior to trial, the State entered a nolle prosequi for the theft count in the second presentment. Then, following the State's proof at trial, the trial court dismissed all three charges from the first presentment because the evidence presented did not correspond to the dates alleged in the presentment. At the conclusion of the trial, the jury convicted the Defendant of the remaining money laundering count, and the trial court sentenced the Defendant as a Range I, standard offender to ten years' incarceration with a release eligibility of thirty percent. On appeal, the Defendant argues: (1) the evidence is insufficient to sustain his money laundering conviction; (2) the trial court erred in providing a jury instruction for theft of property as a part of the jury instruction for money laundering after all the theft charges had been dismissed; and (3) his ten-year sentence is excessive. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JILL BARTEE AYERS, JJ., joined.

_____

[1] Although the Defendant testified at trial that his name was Owen Kim Alley; however, the presentment expresses the name as Kim Owen Alley, so we will refer to him by the name as it appears in the presentment. We intend no disrespect in doing so.

[2] These additional counts were improperly labeled in the second presentment as Counts 3 and 4, rather than Counts 4 and 5.

John S. Anderson (on appeal), Rogersville, Tennessee, and Samuel E. White (at trial), Kingsport, Tennessee, for the Appellant, Kim Owen Alley.

Jonathan Skrmetti, Attorney General and Reporter; Jonathan H. Wardle, Senior Assistant Attorney General; Dan E. Armstrong, District Attorney General; and Amy L. Hinkle, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

**Trial.** **State's Proof.** Chris Wilhoit, a Special Agent with the Tennessee Bureau of Investigation ("TBI") testified that he became involved in this case in January 2017 when the local district attorney and the Rogersville Police Department asked for his assistance in investigating a possible theft. He said that Greg Alley and his wife, Erma Alley, had alleged that they had given the Defendant some money for an investment and that this money had been taken from them. He noted that Greg Alley, who had recently passed away, and the Defendant were brothers.

Agent Wilhoit stated that upon learning of these allegations, he spoke to the Defendant three different times, which resulted in two written statements and one oral statement from the Defendant. During the investigation, Agent Wilhoit asked FBI Agent Michele Yaroma to assist in this case because she had experience in conducting financial investigations.

During the first interview with the Defendant on February 24, 2017, Agent Wilhoit as well as Investigator Travis Fields with the Rogersville Police Department were present. Agent Wilhoit said the Defendant was not promised anything in exchange for his written statement from the first interview. He also said no threats were made to the Defendant and that the Defendant was not in custody during this first interview, which took place at the Rogersville Police Department. The Defendant's signed statement was admitted into evidence.

In this statement, the Defendant said that when his company, TRW, ended its retirement plan, he invested his lump sum of retirement into Forex, a foreign money exchange investment class, which made decent money. After he showed other family members what he was making on that fund, they also invested "as a group" in Forex. The Defendant said that the first trader he used for the Forex fund was Luka Bencan, who was located in Prague. Later, other individuals and family members invested in the Forex fund. The Defendant stated that "[a]t some point Luka Bencan and the other traders made investments that were very risky," which caused the Defendant and the other investors to lose "a lot of money." The Defendant said that his brother, Greg Alley, and Greg's wife, Erma Alley, "also invested a portion of [Erma's TRW] retirement in this venture" and they,

- 2 -

like the rest of the investors, "lost money." The Defendant explained that all of the investors came to him and went through his business, 1Free2Flow, LLC, ("1Free2Flow") to make the investment, and all investors created accounts at NuView IRA, ("NuView") which was where the investors sent their money. He said that "NuView was then directed to send 1Free2Flow the money so [the Defendant] could invest it in Forex." The Defendant said that "all the investors" signed "agreements with boilerplate information." He asserted that he had created 1Free2Flow, LLC "five or six years" earlier to protect himself when he got fired from TRW and "wanted to try different things."

The Defendant maintained that when he filled out Greg and Erma's paperwork, he "never signed their name on anything" and that "Erma always signed the paperwork herself." He said that all the money he took from the investors went into a bank account under 1Free2Flow, LLC, and the investment was made from that account. The Defendant said that when Greg and Erma had been invested for a few months, Greg told him he wanted to buy a boat and asked if he could get $17,000 out of the investment for this purchase. The Defendant "pulled the money out of the investment account" to give to Greg during a "window when [he] could get the money out." Later, Greg told him that he and Erma wanted out of the investment, but he "could not get their money out at that time" and within ninety days, "the investment tanked[,] and there was no money left in the investment."

In August or September 2015, Greg and Kandy, the Defendant's sister, asked the Defendant to write them an "IOU" check for their portion of the investment, and the Defendant "complied under duress." The Defendant said he wrote an $80,000 check to Kandy even though she had already received $25,000 from her investment, although he never knew of Kandy's "attempting to cash that check." The Defendant also wrote Greg a check for $140,000, even though he had already given Greg $17,000 for the boat. He said Greg forced him to write the $140,000 check and then Greg told Kandy that he "now had [the Defendant]" because he had forced the Defendant to "commit a criminal act." The Defendant said he wrote the $140,000 check to Greg from his 1Free2Flow account at Highlands Union Bank. He claimed Greg was mad at him, not because of the investment issue, but because he told Greg that he did not deserve disability income.

The Defendant explained that Erma's money was "invested in an IRA" and she "had to run her money through an investment company so she did not have to pay the taxes or early withdrawal fee." He said that Erma "sent her money to 1Free2Flow through [the] NuView IRA holding company." The Defendant stated that because Erma did not have an email, other than her TRW work email, he "created a gmail account that was [ermaruthalley@]gmail.com for the sole purpose of . . . registering her account at NuView" so he could receive "statements once a month[.]" The Defendant claimed he set up this email at Greg and Erma's direction because neither of them knew how to set up an email account at that time. The Defendant said that he never used the gmail account that he

- 3 -

created for Erma Alley, that Erma picked the password for this email account, and that Erma and Greg used that email to get their statements from NuView. The Defendant said that this "email account had to be set up for the money to go to NuView."

Agent Wilhoit said that the second interview with the Defendant took place on August 17, 2017, at the Rogersville Police Department, with both he and Investigator Fields present. He said the Defendant was not in custody at the time of this interview and that no threats or promises had been made to the Defendant for his statement. During this interview, the Defendant signed a second written statement, which was also admitted into evidence.

In this second statement, the Defendant said that when Greg and Erma wanted to invest in his "venture," he had to go with Greg to Fidelity, where Erma's retirement money was located so that it could be moved to Advanta IRA, which was a "self-directed IRA fund." He claimed he got paperwork from Advanta online, which allowed Greg and Erma to move her money from Advanta to 1Free2Flow, his company, so he "could invest the money for them." The Defendant asserted that this money "should have continued to be under the Advanta IRA shed," even when his company "had the money." He claimed he "never knew or thought that [he] had to report gains or losses to Advanta." The Defendant said that Erma and Greg "could direct the investments anywhere they wanted," and he believed "that through Advanta they could even purchase land under the IRA if they wanted." The Defendant said he "never spoke to anyone who gave [him] money for investments about paying [him] a fee" and that he was "never planning on taking a fee of any sort from anyone who invested with [him]."

The Defendant said he "had an understanding with Luka Bencan" whom he dealt with regarding the foreign exchange market, and that "[i]f the client made money, he kept forty percent of the profit and the client got sixty percent of profit" and then the Defendant would then "get a cut" of the client's profit. The Defendant said that "[i]f the client did not make money, [the Defendant] was not supposed to take any of the principal[.]" The Defendant claimed that he "did not have to have a license to do these things because there [wa]s an exemption in the statute." The Defendant stated that he "formed an LLC for [his] protection and gathered money from other investors . . . by word of mouth[.]" He claimed he "merely filled the paperwork out for these people because they did not know how to do the paperwork." The Defendant said that when Erma moved her money from Fidelity to Advanta, "she signed the paperwork while she was in the shower and did not read the documents to the best of [his] knowledge."

The Defendant stated that the "1Free2Flow [account] was set up for money to be held only for pass through" and this money was "forwarded to the trading bank," which was at the discretion of Luka Bencan. The Defendant said he hired an attorney to form the

LLC and that he only intended for his best friend, Dana Cook, and the Defendant's family to "invest in this venture." He said that if someone gave him money to invest, he could "obtain their money for investment purposes only, deposit the money in 1Free2Flow[,] LLC account[,] and then that entire amount would then be wired to the trading bank for the Forex trader," which in Erma and Greg's case was Luka Bencan. He said he "took the money from the investors with the understanding that [he] could invest the money in Forex or any other venture if [he] wanted" but he "had no intention of diverting funds into anything other than Forex[.]"

The Defendant stated that Luca Bencan used a Forex fund called "FINFX" where money was wired to invest and that Bencan "could not personally touch" the money in this fund under any circumstances. When Bencan began "losing money," the Defendant "took the money out of [his] trading account with FINFX and invested it with another Forex trader." The Defendant said that he "had the account at FINFX" and that "Luka Bencan only had limited access to the account." The Defendant added that he "could put the money in the investment but could not personally touch the money," and that "[a]ny money sent to FINFX was money for [Bencan] to invest." The Defendant asserted that "[t]here was never any profit made from that investment, and any money [the Defendant] received back was because the investment lost money and [the Defendant] was getting it back to reinvest." The Defendant said he got the paperwork for the investors from Advanta and that he knew the investors did not know what this paperwork said, although he knew that the paperwork had to be completed in order for the money to be moved to Advanta.

The Defendant stated, "I provided Advanta with paperwork showing that I was power of attorney for all the money from all investors" and that every investor had to sign the power of attorney forms. He said that the gmail account for Erma Alley "was given to her" and that he "never used that account to communicate with anyone about this investment or to obtain more [money] or invest money." The Defendant said that he received $85,000 and that his wife received $24,000 from TRW when they left the company and that he invested some of that money in 1Free2Flow for growth purposes and for training regarding Forex funds. In addition, the Defendant said that Dana Cook invested $130,000, Donna Golden invested $23,000, Debbie Bundren invested $29,000, and Barbara Alley invested $10,000. The Defendant claimed he was "well under the 2.5 million dollar investment amount" and was "well under the number of people for this investment that was required by statute for the exemption." He said he "never promised anyone that they could gain a certain amount [of money] or a certain percentage" and was prohibited from promising anyone "that they could only lose a certain amount." While he acknowledged that he would have to honor someone's desire to stop investing if they lost a certain percentage of their investment, he claimed that "[n]o one ever told [him] they wanted to stop investing if they lost a certain percentage[.]"

- 5 -

Agent Wilhoit said that his third interview with the Defendant took place on November 14, 2017, at the TBI office in Johnson City. He noted that Agent Yaroma and Investigator Fields were also present, that no promises or threats were made to the Defendant, and that the Defendant was not in custody at the time of the interview. During this interview, the Defendant provided an oral statement that Agent Wilhoit memorialized in a report.

During this oral statement, the Defendant said that he left TRW in Rogersville in 1996 and that he obtained money from people who were part of two waves of retirement buyouts. The Defendant said he contributed $85,000 and also obtained $80,000 from Glen Hobbs and $130,000 from Dana Cook. The Defendant said he invested that money in the Forex fund and lost over $80,000 in one year. The Defendant said that at one point, he contacted an attorney in New York in order to set up an investment fund, which he named 1Free2Flow. The Defendant told the attorney that the money he would be investing was from friends and family, and the attorney said there were different guidelines if he had less than 2.5 million dollars invested or less than fifteen investors. The Defendant said that he and Glen Hobbs were his first investors in the Forex fund and that Hobbs got his money back.

The Defendant explained that Hobbs "got the redemptions for his wife and [the Defendant's] sister, [K]andy, to keep her store." The Defendant stated that he opened his bank account at Highlands Bank with one hundred dollars. He said the $138,000 that was deposited into his 1Free2Flow account came from Avanta IRA and consisted of money belonging to Erma Alley. He explained that $8,000 of Erma's money was used to pay for attorney's fees and that $110,000 of Erma's money was sent to Malta to invest in the Forex fund. The Defendant also said that a $5,000 withdrawal went to his brother for a down payment on a boat. However, the Defendant explained that the money invested by Greg and Erma Alley was actually Erma's money.

The Defendant said that a $4,000 withdrawal went to his sister, Kandy Hobbs, because she needed the money. He also said that both Greg Alley and Kandy Hobbs "had asked for redemptions" and that he got the money to pay them out of the 1Free2Flow account so he did not have to get the money back from Malta. He asserted that he could look at the account in Malta online and that his investors could have also looked at the account online but did not because he was investing their money for them as a fiduciary. When asked why he thought he could take money from his 1Free2Flow account and/or put some of that money in his personal account via check, the Defendant replied that the money was "partially his" because it was "co-mingled." He explained that because he was investing other people's money in the same investment where his money was located, the money he put into the 1Free2Flow account was his because it was "co-mingled."

When Agent Yaroma asked why the Defendant did not write checks to the people who wanted redemptions, the Defendant was unable to answer. The Defendant said they hoped that they would all get rich and that he was in over his head. The Defendant acknowledged that investing in a Forex fund was high risk. The Defendant insisted that he was going to make everyone "whole," and when Agent Yaroma asked how he would accomplish this and what that meant, the Defendant told her he was working on a deal involving wheat and 430,000 acres of land in Egypt where sixty-six combines would be shipped to Egypt. He stated that a man in Texas was part of the deal and that he had given this man $80,000 from Dana Cook to make the trip to Egypt. The Defendant acknowledged that he had lost money on the Forex trading and was currently living off of his mother.

When Agent Yaroma asked the Defendant to explain the transfers of $1,500 on July 1, 2014; $4,500 on July 10, 2014; $1,000 on July 22, 2014, and $1,000 on July 31, 2014, from his 1Free2Flow account to his personal checking account, the Defendant claimed this money belonged to him because it was "co-mingled" money. He claimed the $4,500 amount went to pay for an attorney because of a court case involving him and the Rogersville Humane Society. When asked about a $24,000 check written to cash on or about October 23, 2014, the Defendant said that money was given to Glen Hobbs to pay off the Hobbs building where Kandy had a store called The Mountain Star Mall. When questioned about his investment into the Aurora Hill Forex fund, the Defendant said he invested approximately $148,000 into Aurora Hill fund and received $105,000 back. When Agent Yaroma asked why he did not cut his losses and return whatever money he had to his investors, the Defendant did not have an answer. He stated that certain managers of the Aurora Hill fund came to east Tennessee for a seminar on the investment and that this seminar occurred after he had invested "co-mingled money" with in the Aurora Hill fund.

Agent Wilhoit said that he shared his report of the Defendant's oral statement with Agent Yaroma on December 15, 2017, and she confirmed it was accurate. Agent Wilhoit said that on May 8, 2017, he issued a subpoena for the Highlands Union Bank and received bank statements for the 1Free2Flow bank account 91001933 from December 13, 2013 to April 28, 2017. He also received bank statements from account 92023043, which was the Defendant's personal bank account, from October 29, 2013 to March 3, 2016. Agent Wilhoit confirmed that he had these bank statements when he spoke to the Defendant during the interviews. He said that he was never able to locate any registration or licensing in Tennessee which authorized the Defendant to invest money.

Agent Wilhoit noted that although the Defendant claimed he was part of an exemption, he said he never inquired specifically into this exemption and did not really understand what the Defendant was saying about this exemption. He confirmed that he was unable to locate any employment for the Defendant during the investigation and recalled that the Defendant had said he was living with his mother, Barbara Alley, who was

also one of the investors. Agent Wilhoit said Agent Yaroma informed him that investing in a Forex fund was "high risk" and "involved foreign exchange currency." He said that the Defendant had started the 1Free2Flow account with a deposit of $100.

The bank records for the 1Free2Flow business account showed that there was a deposit made into that account from Advanta IRA Trust, LLC on January 22, 2014, for $138,280.00, which came from Erma Alley. Then there was an $8,000 withdrawal to J.P. Morgan Chase Bank, which the Defendant claimed was payment for an attorney named Riveles. Then on January 23, 2014, $110,000 was wired from the 1Free2Flow account to an account held by Smart Trade FX at the Bank of Valletta in Malta. After paying for some small wire fees, this left a balance of $20,325 in the 1Free2Flow account.

On February 4, 2014, a check for $5,000 was written out of the 1Free2Flow account to the Defendant, and the Defendant deposited $3,500 into his personal bank account and took out $1,500 in cash. On February 14, 2014, a $4,000 check for cash was written out of the 1Free2Flow account.

On April 1, 2014, a $3,000 check was written to the Defendant out of the 1Free2Flow account, which left a balance in 1Free2Flow of $325. The same day, the Defendant deposited $3,000 into his personal account. On April 4, 2014, Smart Trade FX sent $8,935 back to the 1Free2Flow account.

On May 7, 2014, Smart Trade FX deposited $8,947.60 into the 1Free2Flow account, which brought the balance up to $13,707. On May 13, 2014, Advanta IRA deposited $6,463.34 into the 1Free2Flow account. On May 15, 2014, Advanta IRA deposited $12,220.68 into the 1Free2Flow account. On May 16, 2014, a $2,200 check to the Defendant was written out of the 1Free2Flow account. He stated that on May 20, 2014, there was wire to J.P. Morgan Chase Bank for $20,000 and that Advanta IRA deposited $68,362.45 into the 1Free2Flow account.

On June 19, 2014, there was a $1,000 transfer from the 1Free2Flow account to the Defendant's personal bank account. On June 26, 2014, $68,000 was wired to an account at Huntington National Bank that was held by Aurora Hill, LTD, and presumably represented the Aurora Hill fund. On June 30, 2014, Smart Trade FX deposited $90,001.54 into the 1Free2Flow account.

On July 1, 2014, $80,000 was wired from the 1Free2Flow account to the account at Huntington National Bank associated with the Aurora Hill fund. Also on July 1, 2014, a $1,500 check was written out of the 1Free2Flow account to the Defendant, who then deposited this check into his personal account the same day. Sometime in July, $4,500 was transferred to the Defendant's personal bank account. On July 10, 2014, $1,000 was

transferred to the Defendant's personal bank account. On July 31, 2014, another $1,000 was transferred to the Defendant's personal bank account.

On August 12, 2014, there was a $900 transfer from the 1Free2Flow account to the Defendant's personal bank account. On August 22, 2014, there was a check made out to cash, signed by the Defendant, that was written from the 1Free2Flow account, and then $1,000 was transferred to the Defendant's personal bank account the same day. Agent Wilhoit said that in August there was also a $5,000 deposit from the Aurora Hill fund into the 1Free2Flow account.

On October 23, 2014, the Aurora Hill fund deposited $35,000 into the 1Free2Flow account. Thereafter, there was a $24,000 check written to cash and a $4,000 transfer to the Defendant from the 1Free2Flow account. On October 31, 2014, there was a transfer of $2,000 from the 1Free2Flow account to the Defendant's personal bank account.

On December 2, 2014, $18,554.94 was transferred from Fidelity Investment Pension into the 1Free2Flow account. On December 4, 2014, there was a $5,000 transfer from the 1Free2Flow account to the Defendant's personal account. In addition, on December 18, 2014, there was a deposit of $65,672.51 from the Aurora Hill fund into the 1Free2Flow account. On December 29, 2014, there was a $1500 transfer from the 1Free2Flow account into the Defendant's personal bank account.

Agent Wilhoit said that he was told by Greg and Erma Alley that the Defendant had given them a total of $30,000, which consisted of a payment of $20,000, a payment of $7000, and a payment of $3,000. He was able to find the payments of $7,000 on April 8, 2015, and $20,000 on April 22, 2015, in the bank accounts. He also said that on May 7, 2015, the Defendant wrote a $5,000 check out of his personal account to Greg Alley.

Agent Wilhoit confirmed that the Defendant never invested the entire $138,280.00 he received from Erma Alley. He noted that Greg and Erma Alley asked for a redemption of their investment several times.

On cross-examination, Agent Wilhoit acknowledged that he was not an expert in financial crimes and that he had spent fifteen years of his career in drug enforcement, homicides, and officer-involved shooting incidents.

Agent Wilhoit confirmed that on May 13, 2014, $6436.34 from Debbie Bundren was deposited into the 1Free2Flow account. On May 15, 2014, $12,220 from Glen Hobbs was deposited into the 1Free2Flow account. On May 20, 2014, $68,362 from Dana Cook was deposited into the 1Free2Flow account. Agent Wilhoit acknowledged that none of the aforementioned credits had anything to do with Greg and Erma Alley.

Agent Wilhoit admitted that his investigation focused on the two bank accounts rather than on the Forex funds at Valletta or Aurora Hill. However, he and Agent Yaroma did interview Dan Miller, a partner in Aurora Hill, about the Aurora Hill fund.

Michele Yaroma, a Special Agent with the Federal Bureau of Investigation ("FBI"), testified that before she joined the FBI, she was a certified public accountant. She joined the FBI in 1997 in the Washington D.C. office, where she worked in government fraud. Thereafter, she transferred to the Tampa office and worked on a large health care fraud case. After that, she went to the FBI headquarters and worked on terrorist financing and the financial investigation of Enron. She also was a supervisor at the Washington Field office, where she did the background investigations for the White House, and then she became the special assistant to the Associate Deputy Director of the FBI, who was the "number three guy in the FBI." Thereafter, she transferred to the Johnson City Office and became a street agent again.

Agent Yaroma said that she got involved in this case when Agent Wilhoit asked if she would lend her expertise in this case. She was present when the Defendant was interviewed at the TBI office in Johnson City on November 14, 2017. Agent Yaroma explained that a Forex fund invests in foreign currencies and trades on the differences in an attempt to make money. She asserted that Forex was "a very risky investment," which the Defendant also acknowledged during his interview.

Agent Yaroma said that when she asked the Defendant about the $138,000, the Defendant said that he had received in January 2014 from Erma Alley through an Advanta IRA. She said the Defendant told her that of the approximately $138,000 he received from Erma, only $110,000 was invested in a Forex fund in Malta and $8,000 of Erma's money went to pay an attorney named Simon Riveles. She said that the Defendant agreed that he was a fiduciary, which meant that he was "a person who has money or property that is held for the benefit of another person." When she asked why the Defendant believed that he could put money from the 1Free2Flow business account into his personal account, the Defendant replied that "the moneys were co-mingled" and "the moneys were part his."

Agent Yaroma said the Defendant told her he hoped they would all get rich, that he was in over his head, and that a Forex fund was a high risk investment. The Defendant also said he was "not good on a computer" and that when people asked for their money, he kept that record on a Word document, rather than a spreadsheet. She noted that the Defendant used the terms "fiduciary" and "redemption," which meant he had "a level of sophistication" when speaking with her. She said the Defendant used the word "redemption" to mean "when people took their money back from their account." She noted that the way the Defendant was taking money out of the accounts was "unusual" because

he was "writing checks to himself" and was "writing checks to cash" and then would pay his investors back in cash. When she asked him why he did not write a check to his investors if he really wanted to make the investors whole, the Defendant was unable to provide an answer. She said that it became harder and harder for the Defendant to pay people who were asking for their money back. The Defendant told Agent Yaroma that in order to pay his investors back, he had a plan involving 430 acres of land in Egypt involving wheat production and that he would need to send sixty-six combines over there and was either going to give, or had already given $80,000, to a man in Texas to make this trip to Egypt.

When she asked the Defendant about the $24,000 check written to cash on or about October 23, 2014, the Defendant said he had given that money to Glen Hobbs to pay off a building where his wife Kandy had a store called The Mountain Store Mall. Agent Yaroma said she was surprised that the check had been made out to cash rather than to Glen Hobbs directly if the Defendant was trying to track money and trying to pay people out on their redemptions.

Agent Yaroma said that with regard to the Aurora Hill Forex fund, the Defendant told her $148,000 was invested, consisting of an $80,000 investment and a $68,000 investment. He claimed he received a total of $105,000 back on that investment. When she asked him why he did not cut his losses and return the money back to his investors, the Defendant could not provide an answer. When she asked about the cash and the transfers that went into his personal bank account, the Defendant said that on July 10, 2014, he took $4,500 to pay for an attorney related to a lawsuit with the Rogersville Humane Society. The Defendant claimed that he was entitled to move this money over and use it for personal use because the "moneys were co-mingled." The Defendant also said there was a $5,000 withdrawal that he gave to his brother for making a down payment on a boat and a $4,000 withdrawal that he gave to Kandy Hobbs, the Defendant's sister, because she needed the money. She noted that the Defendant admitted he was relying on his mother to live after losing so much money in these investments.

Agent Yaroma said the Defendant claimed that at the very beginning, he invested $85,000, Glen Hobbs invested $80,000, and Dana Cook invested $130,000. She said it seemed that the Defendant was able to move money from the 1Free2Flow account to his personal bank account at will.

When Agent Yaroma began asking the Defendant more pointed questions about his conduct, the Defendant "became more nervous." Although the Defendant used the terms "fiduciary," "redemption," and "Forex," when she asked him more specific questions, the Defendant began to back down from his knowledge and told her he was in over his head with this high-risk investment. When she began asking hard questions, the Defendant

- 11 -

"looked very agitated and nervous" and seemed like he "wanted to leave[.]"  At that point, she changed tactics so she could continue to question him and get as much information as possible.  Agent Yaroma agreed that if the Defendant had decided to leave the interview, he would have been free to go.  She confirmed that the Defendant was not promised anything to stay, but she acknowledged that the tone and tenor of the interview became "more laid back" at that point.

On cross-examination, Agent Yaroma said that prior to her interview with the Defendant, she reviewed the Defendant's prior recorded interview, spoke to Agent Wilhoit about the case, and reviewed documents and spread sheets of summarized financial documents that were not prepared by her.  She confirmed that she did not research how well the Aurora Hill Forex fund did during the time period in question.  She added that she did not know how much money was lost on certain investments, other than what the Defendant told her.

On redirect examination, Agent Yaroma asserted that regardless of how well an investment does, a fiduciary must do what is in the best interest of the client and must follow the wishes of the client.  She said that if the investor wants his or her money back for any reason, then the fiduciary, unless prohibited from doing so, must give the money back.  She explained that the money belongs to the investor and "[t]he fact that it is co-mingled with other people's money is irrelevant because the money is owned by the individual investor."

Agent Yaroma stated that investment advisors never made promises regarding returns because past performance was not indicative of future performance.  She said that "any legit[imate] investment advisor would tell you that there are risks" and they would not make any promises as to what the returns would be.  In addition, investment advisors would inform their investors whether a particular investment is a low, medium, or high risk because the level of risk is something you want to ensure your investors are willing to take on.  Agent Yaroma said that there are no guaranteed ways of predicting what an investment will do, especially in "something that is as high risk and volatile as trading in foreign currencies."

Erma Alley testified that her husband, Greg Alley, was the Defendant's brother.  She stated that she had worked for several decades at TRW, and when TRW offered her a retirement buyout of $239,000, she moved those funds over to Fidelity.  She said that Kandy, her sister-in-law, allowed the Defendant to invest her retirement and was consistently making $4,000 a month, so Greg began talking to the Defendant about having him invest Erma's retirement.  Erma said the Defendant told her that she could trust him, that he could make her "some good money," and that "ten percent would be the most [she] would ever lose."  She explained that she just had a high school education, did not have

much knowledge of investments, and spent her entire career working at TRW. However, she trusted her husband Greg, who took care of most of the financial decisions, and she trusted the Defendant. She said that Greg got cancer and died in 2020.

Erma said she ultimately gave the Defendant $139,000 after he told her that he would make her "some big money" and she would be proud of what he could do. She said she had to get Fidelity to write the check for the initial investment twice and had to sign forms two different times. The second time, the check was written to the Defendant directly, who claimed he was going to invest it "with Advantage or Midland or somebody called Lucas" who was doing really well. She noted that although she received a monthly statement from Fidelity, she never received any statements regarding her investment after she gave the money to the Defendant. After Erma paid a tax bill on her investment and later received another tax bill, Greg went to talk to the Defendant, who had cut off all communications with her. At that time, Greg and Kandy were wanting their money back from the Defendant, who "kept saying that he was going to put it in something else and make good money and he couldn't just get it out . . . right then." At the time, Greg was keeping this information from Erma because he knew it would make her nervous.

When Greg said he wanted to buy a boat, the Defendant gave him a check for $20,000. At the time, Greg tried to get more money back from the Defendant because he was concerned about the investment. Greg then told the Defendant that they needed $40,000 to pay off all their bills and have a little extra money to buy a camper, and although the Defendant said he could not give them $40,000, he did give them $7,000 and $3,000. Erma said that this $10,000 along with the previous $20,000 was all the money they ever got back from the Defendant on her investment. Whenever she asked Greg about why it was so hard to get her money out of that investment, Greg told her that the Defendant was wanting to put her money in other investments and "make more money."

Erma said that the Defendant originally brought her some forms to sign and initial and told her "he would take care of the rest of it." She signed the forms because she trusted the Defendant because he was her husband's brother. Erma said she was never informed that her money was being moved into different funds. Because she became worried, she asked Greg to get the Defendant to send her a statement so she would know how her investment was doing. She thought that her money was just going to "somebody called Lucas or Midland, Advantage or something like that."

Erma said that the Defendant at some point sent her a check for $140,000 that she attempted to cash, but there were insufficient funds to cover the check. At the time, she initially gave the Defendant her money, she had a work email because she was still employed at TRW and she had a personal email. She said she never gave the Defendant permission to set up an email account for her, although Greg discovered that the Defendant

had set up an email address in her name when he "called Midland" and discovered that they were actually sending the statements for her investment to the Defendant instead of her. She said that she knew the Defendant set up this email because he always called her "Erma Ruth" and the email was set up as "Erma Ruth Alley."

Erma stated that the Defendant avoided her and never told her he was sorry about losing her money. When she texted the Defendant, he acted like he would get the money for her, that it would "take a few days," but in reality the Defendant "left town." When she continued to text him asking her for money, the Defendant "skipped town again" and changed cell phone numbers. She said the Defendant's wife, Dena, told her that she did not understand why the Defendant would not give Erma her money back because Dena and the Defendant's mother had gotten their money three weeks after asking for it. Dena said that she had seen Erma's account online and did not understand why she was not getting her money back.

Erma reviewed several texts between her and the Defendant, which were entered into evidence. In these texts, the Defendant provided assurances to Erma that he would return all of the money she invested, that he would "never stop making [her] completely whole," that he hoped she would forgive him, and that he was having to push the deadline to return her money farther and farther back. Eventually, Erma said she sent the Defendant a number of texts to which he never responded.

When asked if there was an agreement that she would pay fees to the Defendant for his services, Erma replied that the Defendant never mentioned any fees and said only that "he would take care of everything," that she did not have anything to worry about, that she "would be making money," that the most she "could lose" was "ten percent[,]" although she would not lose that, and that "he was going to make [her] a rich woman."

Erma said she never gave permission for the Defendant to sign her name electronically. She was under the impression that she had personally signed everything that needed to be signed. She later identified a document that was electronically signed by Erma Alley but claimed this was not her signature. However, she said her signature was on Advanta IRA documents dated January 22, 2014. Erma confirmed that other than the $30,000 the Defendant returned to her, she never received any additional money back from the Defendant.

On cross-examination, Erma acknowledged that her husband Greg did most of the communicating with the Defendant because she was at work. She said Greg would often plead with the Defendant to give Erma's money back. Erma said that the Defendant came to her house twice to get her to sign papers and then came back one more time when her initial check from Fidelity was made out incorrectly. She confirmed that all of these

- 14 -

meetings occurred at the very beginning of her investment, and she never saw the Defendant again. She began getting concerned when she never received any documentation from the Defendant and received bills to pay the taxes for her investment. She admitted that she just briefly read through the documents the Defendant asked her to sign.

Erma stated that the check for $140,000 that she was unable to cash was written by the Defendant because she recognized his handwriting. She acknowledged that her husband Greg was the one who obtained this check from the Defendant and that she was not present at the time.

The State recalled Agent Wilhoit during its case-in-chief. He confirmed that there were numerous transfers from the 1Free2Flow account into the Defendant's personal account, where the Defendant then spent that money on food, gas, credit card payments, and purchases at Walmart.

On cross-examination, Agent Wilhoit acknowledged that the aforementioned expenses were paid out of the Defendant's personal checking account. However, he asserted that the Defendant was taking the money from the 1Free2Flow account and then depositing it into the Defendant's personal checking account. He noted that the Defendant's name was the only name listed on this personal checking account.

**Defense Proof.** Dana Cook testified that he had worked with the Defendant for several years at TRW. He stated that he and the Defendant and several other individuals met with a couple of guys from the Aurora Hill fund. Cook said he moved his retirement funds from a Fidelity Fund to an IRA and then straight to the Aurora Hill fund. He stated that the men from Aurora Hill stated that if the fund went down ten percent, then they would "shut it down" to not lose more money. He said he was unsure whether the Aurora Hill fund lost money or whether the fees on the money invested were more than what they lost as part of the fund. Cook asserted that he was receiving statements from Aurora Hill and that the fund was not doing as well as he had hoped, with the fund losing money "every month." Cook said that after "calling and begging and pleading," he got some of his money out of the Aurora Hill fund, but the company had already lost "a significant amount" of his investment over a period of a few months.

On cross-examination, Cook confirmed that he did not use the Defendant to invest his money in the Aurora Hill fund. Instead, he transferred his money from the IRA straight to the Aurora Hill fund. He asserted that the Defendant never got any of his money. On redirect examination, Cook acknowledged that he lost thousands while invested in the Aurora Hill fund.

Kandy Hobbs testified that the Defendant is her brother and that she had invested money with the Defendant in the past, some of which had made money. Kandy said that when the Defendant invested her money in the Aurora Hill fund, Aurora Hill did not adhere to their own ten percent loss cap on investments, and Aurora Hill's fees were "just thousands of dollars." She said she lost "up to $40,000" on her investment with the Aurora Hill fund. Kandy said that while she, Greg Alley, and the Defendant often talked about the investments, Erma Alley was never a part of those conversations. When asked if she felt that the Defendant kept her informed about what was going on regarding her investment, Kandy replied, "Yes, for the most part, yes." She agreed, looking back, that this was a very bad investment because the men managing the Aurora Hill fund "did not keep their promises." Kandy stated that although she had issues with the Aurora Hill fund, she did not believe that the Defendant took any money from her.

On cross-examination, Kandy said she met with Agent Wilhoit and several assistant district attorneys on January 31, 2018. She acknowledged that she did not receive regular statements concerning the Aurora Hill fund and that she got more "verbal" information about how the fund was doing from the Defendant. Kandy stated that when she went to the Defendant and asked for some of her money back, she said, "Aurora didn't want to[,] but [the Defendant] managed to get some money back." She agreed that at some point, she received $24,000 back from her investment. She also received an "IOU" check for $80,000, which was Greg Alley's idea, but she confirmed that the $80,000 check was not a good check. She did not know the amount of money that the Defendant got back from the Aurora Hill fund. She acknowledged that the Defendant had never given her a statement showing how much of her money was lost in the Aurora Hill fund.

On redirect examination, Kandy stated that she felt like she had good communication with the Defendant throughout the time she was invested in the Aurora Hill fund. Although she did not receive statements, she invested approximately $80,000 and lost at least $40,000. She asserted that the "IOU" check was never a check she could cash or deposit and that it was done "to appease Greg if nothing else." Kandy asserted that she believed the "IOU" check was pointless because the Aurora Hill fund was simply a bad investment that did not end well. On recross-examination, Kandy said that she did not know if the Defendant actually received $105,000 from the Aurora Hill fund, although she had heard he received that amount.

The Defendant testified that he worked for TRW for twenty-four years and received a lump sum retirement buyout from TRW. He stated that he first got into the Forex fund because "Aurora's numbers and everybody else's numbers on the document we ha[d] . . . show[ed] a two[-]year history. One year was forty percent return. The next year was sixty percent return." Although he recognized that there was a risk with the Aurora Hill fund, he claimed it was "only ten percent." The Defendant said that a ten percent loss was "an

industry standard" and that the managers of the Aurora Hill fund had told the Defendant and others, "[I]f we ever lose ten percent[,] we will stop, we will give you your money back." However, the Defendant said that the Aurora Hill fund lost ten percent within three weeks.

The Defendant asserted that every document that had been entered into evidence came from the State. He identified some Aurora Hill fund statements from July 31, 2014 to November 2014. He stated that the July 2014 statement showed that the investment went down 6.43 percent, the August 2014 statement showed it went down an additional 4.26 percent, the September 2014 statements showed it went down an additional 16.79 percent, the October 2014 statement showed it went down an additional 4.06 percent, and the November 2014 statement showed it went down 9.37 percent.

When asked why he did not just pull the investment money out, the Defendant replied:

> Well, . . . when I called them and Dana [Cook] called [them], I invoked the ten percent rule which was our right based on them explaining to a room full of witnesses, everybody, ten percent we quit, ten percent we quit. When I called them[,] they had a lawyer call me [who] said you didn't read the fine print. The fine print says they get [your money] for six months, carte blanche, their money. If they lose, tough luck.

The Defendant questioned whether there was ever any fine print in the documents he signed and claimed he was not sure if "those guys" were "legit[imate] . . . based on what we [were] put through." He acknowledged that Kandy Hobbs got back $24,000 of her investment, although he claimed that in order to get the $24,000 out to save Kandy's store, he had to sign an agreement with an attorney stating that he would never ask them for another dime until the end of the term.

The Defendant acknowledged that the Aurora Hill fund statements were addressed to "1Free2Flow," which was his company, although it no longer existed. He claimed he set up the 1Free2Flow account as a holding account for money until it was transferred. He said everyone who invested through him signed documents sending their money to the 1Free2Flow account before this money were invested in the Aurora Hill fund, where the money was invested together "all in one fund." He said that once the money got to the Aurora Hill fund, it was invested as "1Free2Flow" and was not in individual names. He said it was his responsibility to keep track of how much money each individual invested with him.

- 17 -

The Defendant claimed that his brother Greg approached him about investing Erma's retirement money. The Defendant said he remembered taking the contracts to Erma and Greg's home and that Erma, who was taking a shower, reached her hand out of the shower and signed the contracts. The Defendant stated that although someone named Luka Bencan and others had been mentioned, the money belonging to each of the individuals who invested with him eventually ended up in the Aurora Hill fund. He said that the amounts listed in the statements that were sent to him included every bit of money given to him by investors.

The Defendant confirmed that the July 31, 2014 statement from the Aurora Hill fund, the beginning value was $148,000, and the ending value for the month was $133,476.85, which reflected a drop in the market. He also noted that this statement included $24,000 in management fees, even though the Aurora Hill fund lost $9,523 in the first month. He agreed that in August 2014, the Aurora Hill fund lost around $5,684, and Aurora Hill managers charged the investors $15,890 in management fees. He said that in September 2014, the Aurora Hill fund lost $21,454 and charged $59,000 in management fees. He said that in October 2014, the statement showed the money coming out that went to Kandy Hobbs, that the fund lost $28,098, and that they charged $13,256 in management fees. He stated that in November 2014, the fund lost $6,409, and they were charged $29,000 in management fees.

The Defendant asserted, "As far as Aurora goes, the redemption [i.e., money taken out of the fund] was $65,672 of which I stand guilty of stealing." He added, " I don't deny that the money c[ame] back. That's what came back[,] and I am accused of stealing that amount right there." The Defendant clarified that he did not work for the entity that managed the Aurora Hill fund. He said he never expected that his "twenty-four years with TRW" would be "flushed . . . down the drain[.]"

When asked how much money he invested in the Aurora Hill fund, the Defendant replied:

> At that point we had been to Luka [Bencan] and we been to—like I say, they don't seem [to] like the word co[-]mingled but it all came back and it all went to Aurora . . . [and there] wasn't any reason, really reason to do the math at that point because we were going up there hoping—I mean the bottom line is . . . if they had meant half their promises we'd still be invested in Aurora Hill today[,] if they had done just half of what they [promised].

The Defendant stated that although he and his wife had a retirement sum of $105,000, he did not get that money back. When asked about how much money he lost, the Defendant stated, "[Y]ou know, what has been hammered to the jury as me taking out [money from

the fund], I mean if my sister [can] take out $24,000, [and] my brother and Erma can take out $32,000, I don't see a big problem with me taking money out myself and going to Red Lobster." He agreed that, in his mind, the withdrawals from the 1Free2Flow account represented withdrawals of his investment. The Defendant added, "I know Erma put in thirty something years [at TRW] but [my wife and I] put in forty-two years at TRW[,] and I haven't heard a single person during this five and a half years [have] any concern whatsoever about my money." He claimed that he only took withdrawals in "[m]inimum amounts" from the 1Free2Flow account.

The Defendant asserted that $64,000 "came back" from the investment, and Erma and Greg got a total of $32,000 back on their investment. He claimed that the $5,000 check he wrote to Greg was for the purchase of a boat. He said the other two checks were written to Greg because Greg forbade him from writing them out to Erma on the basis that she would not give him a thing. The Defendant claimed that Greg was planning to leave Erma and that Greg "was smart enough to know he never worked and he was entitled to half her 401K[.]" He acknowledged that Greg felt guilty "because he led [Erma] in this direction, kind of forced her in this direction" with the investment.

The Defendant claimed the "IOU" checks to Kandy and Greg were the result of Greg wanting a record that the Defendant owed him $139,000, even though he promised he would never take this check to the bank. He said that Greg also wanted him to write a check for $80,000 for Kandy. The Defendant agreed to write these "IOU" checks but asserted that they were "not worth the paper they [we]re written on." He claimed Greg told him he would kill him if he refused to write the check. He also said Greg believed that he had forced the Defendant into committing "a criminal act" by writing those "IOU" checks. The Defendant claimed that Greg "[a]bsolutely" knew that the Defendant did not have the money to make these checks good and that Greg believed that the Defendant stole the entire $139,000 that Erma invested, even though Greg received $5,000 to purchase his boat.

The Defendant maintained that he never saw or communicated with Erma because she was always at work. However, he said that Greg came by to see him all of the time. He said that when he first received the approximately $139,000 from Erma, he referred to that amount as an investment, which he then forwarded to "either Luka or Malta or Aurora." The Defendant claimed that all of his investors knew it was "supposed to be a long term investment." He said he was not trying to hide the money and that it was just the way he did the investing "based on what [he] was shown."

The Defendant asserted that the Aurora Hill fund had documentation showing that in its worst year, it made forty percent and then the Aurora Hill fund "turn[ed] right around, nothing changed, and they lost forty percent." He explained that there were "a lot of sleepless nights" when the managers of the Aurora Hill fund refused to give him the money

- 19 -

back. The Defendant said that several family members were in on the investment and that he was "just trying to help people including [him]self."

The Defendant said that the managers of the Aurora Hill fund had a meeting at the Price Community Center and "wanted [him] to get as many . . . people in that room as [he could,] and they came in and they preached their sermon [about investing], two nights in a row, two different groups." He said he went to Aurora Hill managers because he was in over his head regarding the money he had previously invested with "Luka [in] Malta[,]" and he thought the managers of the Aurora Hill fund knew what they were doing and could "recover" the money he had previously lost.

On cross-examination, the Defendant acknowledged that the $24,000 in management fees that were charged in the July 2014 statement were for the entire fund. He admitted that although he was receiving monthly statements from the Aurora Hill fund, he never provided these statements to the other investors, even though he "could have." He said that he had conversations with his investors about how the fund was doing, but he was unable to split up how their individual investment money was doing because it was all invested together.

The Defendant confirmed that Erma gave him at total of $138,280, but he only invested $110,000 and then took $8,000 of this money and paid an attorney "to make sure [he] was square." When he was asked if he was supposed to invest the entire $138,280 amount Erma gave him, the Defendant claimed he could buy an attorney with that money before eventually admitting that it was Erma's money to invest. When asked if he had an agreement with Erma to use any of the $138,280 for personal use, the Defendant replied, "If you want to call that personal, I call it making it legal."

The Defendant claimed that Erma, through the Advanta IRA "paperwork," gave him authority over her money. He admitted that of the approximately $138,000 he received from Erma, $110,000 went to Malta, $8,000 was paid to an attorney, and the remainder, approximately $20,000, remained in his "1Free2Flow" bank account. He acknowledged that he did this with the money Erma had given him, even though he was supposed to invest all approximately $138,000 for her. When he was asked why he did not give Erma's money back to her when Erma asked for it back, the Defendant acknowledged that he received three separate payouts but asserted that Erma had not asked for her money back at the time he received these three payouts. He claimed that Erma and Greg did not ask for her money back until 2015, and "they got money to buy the boat with the leftover [money] from Aurora[.]" The Defendant did not deny moving money from his 1Free2Flow business account to his personal account but denied moving a total of $32,000. The Defendant claimed that he never made any promises to his investors and that he only said he would give it his "best effort."

- 20 -

The Defendant agreed that after all the investors' funds got "co-mingled," he invested $148,000 with the Aurora Hill fund, and he got back $65,672 of this money on November 30, 2014. When asked about the $5,000 redemption in July, the Defendant claimed that his sister Kandy admitted during her testimony that she received this $5,000. The Defendant also acknowledged receiving $35,000 back in October and said that although Kandy received $24,000 of this amount, he did not know what happened to the remaining $11,000 that was returned. He claimed that he did not return any money to Erma until she started asking for it in 2015, and then he gave Erma and Greg $5,000 for their boat in April 2015. When asked if this little bit of money took care of Erma's entire investment amount, the Defendant said that $65,000 was returned by Aurora Hill fund, that Erma and Greg got half of that money, and that "the rest of it was gone."

The Defendant said that Aurora made three redemptions into the 1Free2Flow account: $65,000, $5000, and $35,000, which totaled $105,000. Of this $105,000, Kandy received $24,000, and Debbie got $2,000. When the State asked the Defendant why he felt that he could take this money for his personal use that was returned as a redemption to all investors, the Defendant replied that he only took "[s]mall amounts" and claimed he was entitled to take this money because other people were taking amounts of $5,000 and $30,000. He asserted that he did not give any of the redemption amounts to Erma because "[t]here was no money left to give." He also claimed he had the authority to take money out of the 1Free2Flow business account and put it in his personal account because he claimed it was his business account. He said he did not understand why he was not allowed "a small amount" of that redemption money, given that he and his wife had worked for "forty-two years at TRW." He added, "I am not denying taking money out, I took money out, whatever you say, I took it. Why [could] everybody else [take their money out] and not me, ma'am?"

The Defendant recognized that the past performance of the Aurora Hill fund was "absolutely not" a guarantee of how the fund would perform in the future. He said there was "[n]o reason whatsoever" as to why he took small amounts of $1,000 at a time out of the 1Free2Flow business account. When asked why the Defendant did not tell Erma during their text message exchanges that it was a bad investment and that she lost her money, the Defendant replied, "Because my brother [Greg] threatened to kill me three times." The Defendant said that although he assured Erma she was going to get her money back and even gave her a date she would receive it, he admitted that he only hoped she was going to get her money back and that he "still hoped" he was going to get her money back for her. He asserted, "I would love to get the money and give everybody their money back including mine." When asked why he did not write a check to the investors when the money was coming back in, the Defendant claimed that the managers of the Aurora Hill fund had

already taken everything at that point, other than $64,000. He claimed that he gave Erma and Greg back $20,000, $7,000, and $5,000.

On redirect examination, the Defendant asserted that the statements from the Aurora Hill fund were the most important evidence in this case. Thereafter, the defense, without objection from the State, asked that all of the Aurora statements be admitted into evidence.

The exhibits admitted at trial in this case showed the following financial transactions:

| Date | 1Free2Flow Acct. | Defendant's Personal Acct. | To Cash | Valletta Fund | Aurora Hill Fund | Investors | Description |
|---|---|---|---|---|---|---|---|
| 12/13/13 | $100.00 | | | | | | Defendant's initial deposit |
| 1/22/14 | $138,280.00 | | | | | ($138,280.00) | From Erma Alley's Advanta IRA account |
| 1/23/14 | ($8,020.00) | | | | | | $8,000 wired to JP Morgan Chase Bank for Riveles Law Group; $20 wire fee |
| 1/23/14 | ($110,035.00) | | | $110,000.00 | | | $110,000 wired to Valletta Fund; $35.00 wire fee |
| 2/4/14 | ($5,000.00) | $3,500.00 | $1,500.00 | | | | Check made out to Defendant |
| 2/14/14 | ($4,000.00) | | $4,000.00 | | | | Check made out to cash with Memo line of "For Kandy" |
| 3/4/14 | ($3,500.00) | $1,500.00 | $2,000.00 | | | | Check made out to Defendant |
| 3/20/14 | ($4,500.00) | | $4,500.00 | | | | Check made out to cash |
| 4/1/14 | ($3,000.00) | $2,000.00 | $1,000.00 | | | | Check made out to Defendant |
| 4/4/14 | $ 8,935.00 | | | ($ 8,935.00) | | | Funds received from Valletta |
| 4/17/14 | ($4,500.00) | $3,000.00 | $1,500.00 | | | | Check made out to Defendant |
| 5/7/14 | $8,947.60 | | | ($8,947.60) | | | Funds received from Valletta |
| 5/13/14 | $6,463.34 | | | | | ($6,463.34) | From Debbie Bundren's Advanta IRA account |
| 5/13/14 | ($9,020.00) | | | | | | Wire to JP Morgan Chase Bank; $20 wire fee |
| 5/15/14 | $12,220.68 | | | | | ($12,220.68) | From Glen Hobbs' Advanta IRA account |

| Date | | | | | | | Description |
|---|---|---|---|---|---|---|---|
| 5/16/14 | ($2,200.00) | | $2,200.00 | | | | Check made out to Defendant but not deposited to his personal account |
| 5/20/14 | $68,362.45 | | | | | ($68,362.45) | From Dana Cook's Advanta IRA account |
| 5/20/14 | ($20,020.00) | | | | | | Wire to JP Morgan Chase Bank; $20 wire fee |
| 6/19/14 | ($1,000.00) | $1,000.00 | | | | | Online Transfer to Defendant's Personal Account |
| 6/26/14 | ($68,020.00) | | | | $68,000.00 | | Wire to Aurora Hill Fund; $20 wire fee |
| 6/30/14 | $90,001.54 | | | ($90,001.54) | | | Funds received from Valletta |
| 7/1/14 | ($80,020.00) | | | | $80,000.00 | | Wire to Aurora Hill Fund; $20 wire fee |
| 7/1/14 | ($1,500.00) | | $1,500.00 | | | | Check made out to Defendant that he cashed |
| 7/1/14 | ($1,500.00) | $1,500.00 | | | | | Online transfer to Defendant's personal account |
| 7/10/14 | ($4,500.00) | $4,500.00 | | | | | Online transfer to Defendant's personal account |
| 7/22/14 | ($1,000.00) | $1,000.00 | | | | | Online transfer to Defendant's personal account |
| 7/31/14 | ($1,000.00) | $1,000.00 | | | | | Online transfer to Defendant's personal account |
| 8/12/14 | ($900.00) | $900.00 | | | | | Online transfer to Defendant's personal account |
| 8/22/14 | $5,000.00 | | | | ($5,000.00) | | Funds received from Aurora Hill Fund |
| 8/22/14 | ($1,000.00) | | $1,000.00 | | | | Check made out to cash |
| 8/22/14 | ($1,000.00) | $1,000,00 | | | | | Online transfer to Defendant's Personal Account |
| 9/8/14 | ($1,000.00) | $1,000.00 | | | | | Online transfer to Defendant's personal account |
| 9/15/14 | ($2,000.00) | $2,000.00 | | | | | Online transfer to Defendant's personal account |
| 10/23/14 | $35,000.00 | | | | ($35,000.00) | | Funds received from Aurora Hill Fund |
| 10/24/14 | ($24,000.00) | | | | | $24,000.00 | Check made out to cash, which was given to Glen or Kandy Hobbs |

| Date | | | | | | | |
|---|---|---|---|---|---|---|---|
| 10/24/14 | ($4,000.00) | $4,000.00 | | | | | Online transfer to Defendant's personal account |
| 10/31/14 | ($2,000.00) | $2,000.00 | | | | | Online transfer to Defendant's personal account |
| 11/10/14 | ($2,000.00) | $2,000.00 | | | | | Online transfer to Defendant's personal account |
| 11/10/14 | ($1,000.00) | | $1,000.00 | | | | Check made out to Defendant but not deposited to his personal account |
| 12/2/14 | $18,554.94 | | | | | | Received from Fidelity Investments but with no record of who owned these funds |
| 12/4/14 | ($5,000.00) | $5,000.00 | | | | | Online transfer to Defendant's personal account |
| 12/18/14 | $65,672.51 | | | | ($65,672.51) | | Money received from Aurora Hill Fund |
| 12/29/14 | ($1,500.00) | $1,500.00 | | | | | Online transfer to Defendant's personal account |
| 1/5/15 | ($2,000.00) | $2,000.00 | | | | | Online transfer to Defendant's personal account |
| 1/23/15 | ($4,000.00) | $4,000.00 | | | | | Online transfer to Defendant's personal account |
| 1/23/15 | ($2,000.00) | | $2,000.00 | | | | Check made out to cash |
| 2/2/15 | $2,000.00 | ($2,000.00) | | | | | Online transfer to Defendant's personal account |
| 2/2/15 | ($4,000.00) | $4,000.00 | | | | | Online transfer to Defendant's personal account |
| 2/4/15 | ($2,000.00) | | $2,000.00 | | | | Check made out to cash |
| 2/12/15 | ($6,000.00) | | $6,000.00 | | | | Check made out to cash |
| 2/20/15 | ($5,500.00) | $5,500.00 | | | | | Online transfer to Defendant's personal account |
| 3/2/15 | ($5,000.00) | | | | | $5,000.00 | Check made out to Kandy Hobbs |
| 3/3/15 | ($5,000.00) | $5,000.00 | | | | | Online transfer to Defendant's personal account |
| 3/19/15 | ($3,020.00) | | | | | | Wire to Chase Bank for "World One Global"; $20 wire fee |

| Date | Amount | Deposited | Cash | Valletta | Aurora | | Description |
|---|---|---|---|---|---|---|---|
| 3/27/15 | ($2,000.00) | | | | | $2,000.00 | Check made out to Donna Golden |
| 4/2/15 | ($5,000.00) | $5,000.00 | | | | | Online transfer to Defendant's personal account |
| 4/8/15 | ($7,000.00) | | | | | $7,000.00 | Check made out to Greg Alley |
| 4/17/15 | ($1,500.00) | | $1,500.00 | | | | Check made out to Defendant but not deposited into his account |
| 4/21/15 | ($2,500.00) | | $2,500.00 | | | | Check made out to cash |
| 4/22/15 | ($20,000.00) | | | | | $20,000.00 | Check made out to Greg Alley so he could purchase a boat |
| 5/7/15 | ($5,100.00) | $5,100.00 | | | | | Online transfer to Defendant's personal account |
| 6/26/15 | ($140.00) | $140.00 | | | | | Online transfer to Defendant's personal account |
| **TOTALS** | | **$67,140.00** Total Amount Deposited into Defendant's personal account from 1Free2Flow account | **$34,200.00** Total Amount of the Cash the Defendant took from 1Free2Flow Account | **$107,884.14** Total Redemptions from Valletta Fund | **$105,672.51** Total Redemptions from Aurora Hill Fund | | |

At the conclusion of the trial, the jury convicted the Defendant of money laundering, and the trial court sentenced the Defendant as a Range I, standard offender to ten years' incarceration.

Following trial, the Defendant filed a timely motion for new trial, asserting in pertinent part that the evidence was insufficient to sustain his money laundering conviction. Later, the Defendant hired new counsel, who filed an amended motion for new trial, alleging that the Defendant should have received a lesser sentence. Following a hearing, the trial court denied the motion for new trial. Thereafter, the Defendant filed a timely notice of appeal.

## ANALYSIS

**I.  Sufficiency of the Evidence.**  The Defendant argues that the evidence is insufficient to sustain his conviction for money laundering. First, the Defendant claims

that there is no proof that the funds were derived from criminal activity. Second, he claims that the evidence does not show that he attempted to conceal the source of the funds. Finally, the Defendant argues that "spending proceeds from forged instruments does not constitute money laundering." See State v. Jackson, 124 S.W.2d 139, 144-45 (Tenn. Crim. App. 2003) (concluding that defendant's attempt to purchase merchandise by passing a forged check was an act of forgery, not money laundering). The State counters that there was more than sufficient evidence to sustain the Defendant's conviction. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

The Defendant asserts that the evidence is insufficient to sustain his conviction for

- 26 -

money laundering.  In Tennessee, money laundering can be committed one of two ways, either (1) money laundering by concealment, or (2) promotional money laundering.[3]  See Tenn. Code Ann. § 39-14-903(a), (b); State v. Allison, 618 S.W.3d 24, 33 (Tenn. 2021).  In this case, the Defendant was charged with promotional money laundering.

The crime of promotional money laundering occurs when an individual "knowingly use[s] proceeds derived directly or indirectly from a specified unlawful activity with the intent to promote, in whole or in part, the carrying on of a specified unlawful activity."  Id. § 39-14-903(b)(1).  For the purposes of the money laundering statute, the phrase

> "[k]nowingly uses or attempts to use proceeds derived directly or indirectly from a specified unlawful activity" means that any person or party to the transaction or act knew that the property or proceeds involved in the transaction or act represented or constituted, either in whole or in part, proceeds from some form, though not necessarily which form, of any criminal offense under the laws of this state, or any other jurisdiction.

Id. § 39-14-902(3).  "'Proceeds' includes gross profits from the commission of any specified unlawful activity, including property, real, personal or intangible of any kind, acquired or derived, directly or indirectly, from, produced through, realized through or caused by an act or omission[.]"  Id. § 39-14-902(4).  "Specified unlawful activity" is defined as "any act, including any preparatory or completed offense, committed for financial gain that is punishable as a felony under the laws of this state[.]"  Id. § 39-14-902(6)(A).

Promotional money laundering "criminalizes certain acts involving criminally derived proceeds that, rather than being done with the intent to conceal aspects of the criminally derived proceeds, are undertaken with the intent to promote the carrying on of unlawful activity."  Allison, 618 S.W.3d at 33 (citing Tenn. Code Ann. § 39-14-903(b)(1), (c)(1)); cf. United States v. Skinner, 946 F.2d 176, 177-78 (2d Cir. 1991) (recognizing that the federal crime of promotional money laundering was intended "to reach conduct that went beyond the concealment of proceeds of criminal activity" and "to make unlawful a broad array of transactions designed to facilitate numerous federal crimes").  The pattern jury instruction for promotional money laundering requires the State to prove the following elements beyond a reasonable doubt:  "(1) that the defendant knowingly used proceeds with the intent to promote, in whole or in part, the carrying on of [a specified unlawful

---

[3] The money laundering statute also outlines a third, narrow type of money laundering that arises in situations like a police sting, where the defendant conducts a financial transaction with property or proceeds represented to be derived from a specified unlawful activity with the intent to either conceal the nature or source of the criminally derived proceeds or with the intent to promote the carrying on of a specified unlawful activity.  See Tenn. Code Ann. § 39-14-903(c)(1).

activity]; (2) that the proceeds were derived directly or indirectly from [a specified unlawful activity]; and (3) that the defendant knew that the property or proceeds were derived from some form of criminal activity." 7 Tenn. Prac. Pattern Jury Instr. T.P.I.— Crim. 11.19 (Part B).

The "paradigmatic example" of promotional money laundering is where "'a drug dealer us[es] the proceeds of a drug transaction to purchase additional drugs and consummate future sales.'" Allison, 618 S.W.3d at 40 (quoting United States v. Warshak, 631 F.3d 266, 317 (6th Cir. 2010)). However, promotional money laundering also occurs when a defendant's entire business operation is a fraudulent or criminal scheme, and the business funds are used to promote this scheme. See State v. Burkes, No. E2017-00079-CCA-R3-CD, 2018 WL 2194013, at *9 (Tenn. Crim. App. Oct. 10, 2017) (concluding that the evidence was sufficient to sustain the promotional money laundering conviction when "the defendant knowingly used the money that he retained by evading his sales tax obligation as the means to continue his scheme to underpay his taxes [for his business] and illegally retain money that rightfully belonged to the State"); see also Warshak, 631 F.3d at 318-19 (affirming a federal promotional money laundering conviction when the defendant's "sales operation was, for the entire duration of its existence, little more than a colossal fraud," when "the proceeds from fraudulent sales were mixed with the proceeds of any arguably above-board sales," and that the payments to the employees "were intended to . . . encourage future commitment to the criminal endeavor").

At the motion for new trial hearing, the trial court held that "the evidence was sufficient to justify the conviction for money laundering." It noted that the Defendant "diverted money that was provided to him for an investment to pay an attorney," even though it was clear that Erma Alley provided this money to the Defendant for an investment. The court also noted that both Erma Alley's and the Defendant's testimony at trial showed that this was "not perceived to be a high risk investment" because any loss would be capped at ten percent. In addition, the trial court emphasized that the Defendant never told Erma Alley, "Look, I lost your money, I'm sorry, I did what I could"; instead the Defendant just "cover[ed] up, cover[ed] up, lie[d], lie[d], lie[d]" to Erma and Greg Alley. The court said that when you "factor all that in and you look at the way that the transactions were happening, money going into this account, going into that account, this account, that account, pulling money out, the fact at the very beginning when the initial check was written, [the Defendant] diverted a substantial . . . amount of the money without even investing it and immediately diverted it to pay an attorney, which was not discussed with Erma Alley."

Based on the proof presented at trial, a rational jury could have found that the Defendant took Erma Alley's $138,280, as well as other investor's funds, with the intent to use at least some of this money for himself, that he did use some of Erma's money for

his own personal benefit (by diverting $8,000 for the attorney from these funds, by investing only $110,000 in the Valletta fund, by transferring only part of Erma's funds redeemed from the Valletta fund into the Aurora Hill fund, and by moving the remainder of these funds from the 1Free2Flow account into the Defendant's personal account); that the Defendant then mixed the remainder of Erma's investment ($80,000) with money received from other investors in the Aurora Hill fund without notifying Erma that he was moving her investment into the Aurora Hill fund; that the Defendant continued to remove money for his own personal use that the investors had deposited into the 1Free2Flow account, which the Defendant never fully transferred into the investment accounts; and that the Defendant redeemed money from the Aurora Hill fund back into the 1Free2Flow account so he could continue taking money from the 1Free2Flow account for his own personal use. In other words, the proof supported a finding that the Defendant knowingly used money he had stolen from Erma and the other investors with the intent to promote further thefts from the investors' deposits into the 1Free2Flow account and from their investments in the Aurora Hill fund.

First, the Defendant contends that there is no evidence that the funds invested by him were derived from criminal activity. We disagree. While Erma and the other investors willingly deposited their funds into the 1Free2Flow account to be invested, the Defendant took this money with the intent to use some of it for himself and ultimately did use some of Erma's money and the other investors' money for his own benefit. Specifically, the Defendant immediately took $8,000 of Erma's investment to pay for his own attorney and then failed to invest the remainder of Erma's funds in the Valletta fund. Next, the Defendant emptied Erma's investment account at the Valletta fund without her knowledge, withdrawing a total of $107,884.14 in three parts before depositing only $80,000 into the Aurora Hill fund, again without Erma's knowledge. The Defendant then used the remaining $27,884.14 that he took from Erma's money at the Valletta fund for his own benefit and then redeemed investor monies from the Aurora Hill fund into the 1Free2Flow account, which he also used for his own benefit.

Second, the Defendant also claims the proof is insufficient to sustain his conviction because it does not show he attempted to conceal the source of the funds. However, as we have outlined above, Code section 39-14-903(b)(1), unlike subsection (a)(1), contains no element requiring the State to show that the defendant had "the intent to conceal or disguise the nature, location, source, ownership or control of the criminally derived proceeds." Compare Tenn. Code Ann. § 39-14-903(b)(1) with id. § 39-14-903(a)(1); see Burkes, 2018 WL 2194013, at *9. Because concealing the source of the funds is not an essential element of promotional money laundering, which is the crime with which the Defendant was charged and convicted in this case, he is not entitled to relief on this basis.

Lastly, the Defendant cites Jackson, 124 S.W.3d at 144, for the proposition that

"spending proceeds from forged instruments does not constitute money laundering." However, in Jackson, the defendant was convicted of money laundering by concealment, not promotional money laundering, and the defendant argued that the evidence was insufficient to sustain his conviction for money laundering because the State failed to establish that he attempted to negotiate the stolen, forged check with the intent to conceal the source or ownership of the criminally derived proceeds. Id. at 142. The Jackson court, recognizing that Tennessee's Money Laundering Act of 1996 was modeled after the federal Money Laundering Control Act of 1986, noted that both acts prohibit financial transactions designed to conceal or disguise the source, ownership, or control of the proceeds of specified unlawful activities. Id. at 144. The court then observed that federal courts had held that "an accused who simply uses the proceeds of illegal activity to purchase items[] is not guilty of money laundering" because money laundering requires that "the [financial] transaction be designed to conceal." Id. Accordingly, the Jackson court held that the defendant's attempt to purchase merchandise by passing a forged check was "a classic case of forgery." Id. The court then concluded that because the proof did not show that the defendant "possessed the intent to 'conceal or disguise' criminally derived proceeds," the evidence was insufficient to sustain the defendant's conviction for money laundering. Id. at 145.

Here, the evidence established that the Defendant did far more than simply take money from Erma Alley and the other investors and then spend it. Instead, the Defendant took Erma's money, immediately diverted $8,000 of it to pay his attorney, moved part of the remainder of Erma's money into the Valletta fund, redeemed some of that money for his own use, moved Erma's money out of the Valletta fund and put only part of it into the Aurora Hill fund, where Erma's money was combined with other investors' funds, and then methodically depleted all of the available funds from the Aurora Hill fund, using a large portion of these funds for his own benefit. Accordingly, we conclude that this evidence is more than sufficient to sustain the Defendant's conviction for promotional money laundering.

**II. Jury Instruction.** The Defendant also argues that the trial court erred in including an instruction for theft of property in the instruction for money laundering after the court dismissed all of the theft charges. He asserts that there was no need to instruct on theft because theft is not a lesser included offense of money laundering. He also claims that the instruction at issue, which contained the elements of theft, clearly confused the jury, given that it was only deliberating on the charge of money laundering. Lastly, he claims that "[t]heft and spending the proceeds is not money laundering" and that the trial court's error "in including jury instructions as to what constitutes theft and that theft of more than $1000.00 is an essential element of the crime of money laundering is reversible error." In response, the State argues that the Defendant waived this issue by failing to object to the content of this jury instruction at trial and by failing to raise this jury

- 30 -

instruction issue in any of the three motions for new trial that he filed. The State also asserts that, waiver notwithstanding, the Defendant is not entitled to relief because the money laundering statute and the pattern jury instruction require the State to identify the "specified unlawful activity" from which the proceeds were derived and the "specified unlawful activity" that the proceeds were used to promote, which in this case was felony theft greater than $1,000. See Tenn. Code Ann. §§ 39-14-903(b)(1), 39-14-902(6)(A); see also id. 39-14-105(a)(2).[4] We conclude that the this issue is waived and that, in any case, the Defendant is not entitled to relief.

The Defendant waived this issue because he did not include it in any of his motions for new trial. See Tenn. R. Crim. P. 30(b); State v. Faulkner, 154 S.W.3d 48 (Tenn. 2005). The Defendant was not required to object to this instruction at trial in order to preserve this issue for appeal. See id. However, the Defendant was required by Tennessee Rule of Appellate Procedure 3(e) to include this issue in his motion for new trial. Rule 3(e) provides that "no issue presented for review shall be predicated upon error in . . . jury instructions granted or refused . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Because the Defendant did not include this jury instruction issue in any of his three motions for new trial, this issue is waived.

In any case, the Defendant is clearly not entitled to relief. At trial, the trial court dismissed the theft count from the first presentment solely because the timeframe alleged did not match the evidence presented at trial. However, the trial court never suggested that the evidence failed to show that a theft was committed, only that the proof did not correspond to the dates alleged in the theft count of the presentment. During a jury out hearing on the motion for judgment of acquittal, the court specifically asserted:

> [T]he fact that the theft of property is dismissed doesn't impact the money laundering count at all because you can indict money laundering and just insert the elements of theft into the money laundering statute. In other words, you can charge somebody with money laundering without also charging them with theft.

The trial court added that there was "no question" proof was presented that would have met the required elements for the theft and business practices offenses "but the problem" was that it was "nowhere near and around the time frame for which the indictment alleges and the defendant is entitled to notice for that." The trial court then instructed the jury that

---

[4] Currently, theft over $1,000 is the lowest grade of theft that is a felony. See Tenn. Code Ann. § 39-14-105(a)(2). However, at the time of the offense in this case, a theft over $500 was a felony. See id. § 39-14-105(a)(2) (Supp. 2013).

because "the evidence coincide[d] with that particular time frame alleged" in the money laundering count, the jury would "only be focusing" on that particular count, and the court would be dismissing the theft count and two unlawful business practices counts.

At the motion for new trial hearing, the trial court reiterated that it dismissed the theft count at the close of the State's proof because the presentment alleged that the theft offense occurred over a span of time and there was no evidence presented at trial that any criminal act had occurred during that time frame.

We conclude that there is nothing in the record to show that the jury did not understand (1) the theft charge had been dismissed because the proof did not correspond to the time frame alleged in the presentment and (2) the jury should only consider the evidence of theft in connection with the money laundering charge. Both the money laundering statute and the pattern jury instruction, which was utilized by the trial court in this case, require the State to identify the "specified unlawful activity" from which the proceeds were derived and the "specified unlawful activity" that the proceeds were used to promote, which in this case was felony theft greater than $1,000. See Tenn. Code Ann. § 39-14-903(b)(1); 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 11.19 (Part B). Accordingly, the Defendant is not entitled to relief.

**III.  Sentencing.**  Lastly, the Defendant contends that the trial court erred in imposing a ten-year sentence for his conviction. He claims that his sentence is excessive given that his only prior conviction was for a first offense DUI, that he complied with all the terms of being on bond for five years, and that the State did not request that any enhancement factors be applied. In addition, the Defendant argues that the trial court's application of enhancement factor (6), that the personal injury inflicted was great, and enhancement factor (14), that he abused a position of private or public trust, was error because these factors applied to theft but not money laundering, which was the only remaining charged offense. Finally, the Defendant asserts that the trial court "used the crime itself that [he] was convicted of as an enhancement factor." The State responds that the trial court properly sentenced the Defendant. We agree with the State.

Pursuant to State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012), this court reviews sentencing decisions under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." The 2005 amendments to the sentencing act "served to increase the discretionary authority of trial courts in sentencing." Id. at 708. In light of this broader discretion, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." Id. at 706. The amendments to the sentencing act also "rendered advisory the manner in which the trial court selects a sentence

within the appropriate range, allowing the trial court to be guided by—but not bound by—any applicable enhancement or mitigating factors when adjusting the length of a sentence." Id.

Although the application of these factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114." Tenn. Code Ann. § 40-35-210(b)(5). In addition, the trial court must place on the record "[w]hat enhancement or mitigating factors were considered, if any," as well as "[t]he reasons for the sentence" in order to "ensure fair and consistent sentencing." Id. § 40-35-210(e).

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's specific sentence:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Id. § 40-35-210(b). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401, Sentencing Comm'n Cmts. The trial court shall impose "a sentence justly deserved in relation to the seriousness of the offense[.]" Id. § 40-35-102(1). The court must also consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102(3)(C), -103(5). In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. §§ 40-35-103(2), (4).

After hearing proof and arguments at the sentencing hearing, the trial court noted that the defense did not argue for any mitigating factors and found that no mitigating factors applied. The court stated that although the State had not argued for any particular enhancement factors, it applied enhancement factor (6), that "[t]he personal injuries inflicted upon, or the amount of damage to property sustained by or taken from, the victim was particularly great." Id. § 40-35-114(6). With regard to this factor, the court noted the testimony provided by Erma Alley "about the devastating impact that this had on her retirement, the fact that she trusted [the Defendant] to invest this money based on the promises of significant returns that she was expecting and the representations that the most she could lose would be a very minimal amount[,] when in fact that just simply turned out to not be correct [at] all." The trial court also applied enhancement factor (14), that the Defendant "abused a position of public or private trust[.]" Id. § 40-35-114(14). Regarding this factor, the court stated that the Defendant abused a position of private trust in order to commit the money laundering offense. The court found that this was supposed to be "an inner family or a close friend type of investment[,] and it wasn't something that was open to the public at large[.]" It also referenced Erma Alley's testimony about trying to get her money back as well as all the text messages she sent to the Defendant in an attempt to get her money back. The trial court also recognized that the Defendant wrote worthless checks to Kandy Hobbs and Erma Alley for the "amount of money that ha[d] been stolen or misappropriated[.]"

After the trial court announced that it was required to follow the purposes and principles of sentencing in Code sections 40-35-102 and -103, it asserted that the Defendant had been found guilty of a Class B felony, which carried a sentence range of eight to twelve years. See id. § 40-35-112(a)(2). The court held that in this case, "restitution sounds great but there is no way to obtain that" because the Defendant has "no money." The court also recognized that the Defendant, who had been convicted of a Class B felony, was not considered a favorable candidate for alternative sentencing. See id. § 40-35-102(6)(A).

The trial court then reviewed the text messages between Erma Alley and the Defendant regarding the return of the money she invested with him. The court found that there was "no question" that the Defendant failed to inform Erma Alley "about the amount that he could lose" or "the risky nature of her investments." The court then explained:

> If you look through the track of things[,] it is not simply that bad investments were made. From the very beginning . . . part of [Erma] Alley's money was siphoned off and used to pay an attorney. She had no idea about that and that was clear from [the Defendant's] testimony in the trial.
>
> Basically [the Defendant] took investment money from [Erma] Alley [and] a handful of other people and he used the money like it was his own.

He paid a lawyer in New York that assisted in this. He was sending the money overseas, to Prague and different places and invested in risky foreign exchange investments with people he never met, people he didn't know. It is one thing if you are investing your own money foolishly but it's another thing when you take other people's money and represent to them that you are going to make prudent investments and then from Day One you start siphoning money off to pay a lawyer that the person has no knowledge of, no authorization for and then not only that but you don't invest all of their money to begin with in the investment you solicited the funds to invest. The [c]ourt noted that . . . the [prosecutor] on cross[-]examination highlighted that[] all the money was never invested to begin with[,] at least in the foreign exchange investments.

One could look at it possibly from the perspective of, well, is this just a bad investment. Well, siphoning off the money to pay for lawyers and things without authorization and the fact that [the Defendant] was able to run money through his account and basically, as his sister indicated, . . . treat[] it as his own basically. We have money paid to cash, paid to [the Defendant], cash, running through his account. It's a disturbing set of events.

The court also recognized:

[I]f this was simply an investment situation in which Ms. [E]rma Alley turned over some money to [the Defendant] to invest, it went bad, he called her up and said, hey, we have lost the money, I'm sorry, that's it. That's one thing. That's not what we have.

We have a web of . . . deceit and deception and misrepresentation. Not only did we hear oral testimony about it but we have got the text message [proof] right here. It's more than just a bad investment.

The trial court also made findings about the type of investments the Defendant was making in this case:

It is not something that you are just going to stumble into. That is something that you have to take time looking into, researching out, finding people to handle these kind[s] of transactions for you. It's not a standard typical investment or buying a bond or buying a share of U.S. Bank to use an example. It is much more complicated.

For that purpose [the Defendant] did research, found a lawyer [who] handled these kind[s] of transactions in New York, found people in Prague and different places around the world to line up investments and to handle investments. That is not something a casual, inexperienced novice investor is going to be able to do. . . .

I don't think [the Defendant] is this uneducated individual and I am trying to say this without using any inappropriate descriptive terms, he may not have a degree in finance, he may not have a degree in accounting, although his sister does, which is interesting because he certainly, presumably, could have consulted [her] about some of this if he had questions before he got himself into this situation. But be that as it may, [the Defendant] set up a company so it's not him doing it individually. We had the name, we had the accounts. This is not something that somebody just took money, put it in their personal bank account, bought a few shares of stock. This is a complicated . . . set of transactions that involve knowledge and experience that the average person is not going to have[,] and [the Defendant] had that experience.

. . . .

I don't find that [the Defendant] is some poor, foolish, ignorant investor [who] didn't know what he was getting into. [The Defendant] is much more sophisticated[,] and you can tell that by the terminology he uses, the types of investments he was selecting[,] and he knew they were risky . . . .

[If the Defendant] found investments that had . . . paid off . . . , he would have done quite well[,] but it didn't. The problem that the Court has is not that [the Defendant's] investments . . . went bad, it's the mechanism, the manner in which the transactions were conducted, flowing money through the . . . business account, then paying lawyers, investing part of the money, moving part of the money, . . . and then the promises that I am going to get you the money back, deception on how long it was taking to get the money back and faking the close [of the investment] and all that. I mean basically [the Defendant] was scrambling for time to try to figure out some way to be able to cover this. He just told one lie after another lie hoping to be able to find a way to get the money to be able to cover it. Some people might not like the term lie, maybe it's misstatement, misrepresentation, it doesn't matter. At the end of the day he told things that weren't true to individuals to pacify or buy more time. Ultimately it finally reached a point

[where] his resources were tapped out and he wasn't going to be able to cover it . . . .

. . . .

But simply what the Court sees here is a type of manipulation and monetary maneuvering that fits the definition of money laundering, all attempting to cover up the source, the origin, the ownership of that fund and ultimately as was introduced at trial, [Erma] Alley lost a considerable amount of her money, not only through the investments and misrepresentations but just diversion of her funds immediately upon receiving them to pay a lawyer. That should have been . . . an expense of . . the business, not an expense attributed to [Erma] Alley.

The trial court noted that the Defendant had "virtually no record" because his only previous conviction was for a first offense DUI, which was a Class A misdemeanor. After taking all these facts and circumstances into consideration, the trial court imposed a sentence of ten years. The court also found that it could not order the Defendant to pay restitution because the Defendant's sole source of income was his social security, which would be terminated upon his incarceration.

When considering this issue of the Defendant's sentence at the motion for new trial hearing, the trial court asserted that it "conducted a full sentencing hearing" and that it "made all the appropriate findings on the record as to why the court was sentencing [the Defendant] in the manner that it was." Consequently, the trial court held that it was "unpersuaded that [the Defendant] is entitled to any new sentencing hearing or additional consideration[.]"

First, the Defendant claims that his sentence is excessive given that his only prior conviction was for a first offense DUI, that he complied with all the terms of being on bond for five years, and that the State, who requested a sentence of ten years, did not ask for any enhancement factors to be applied. The record shows that the trial court noted the Defendant's almost nonexistent criminal history and the fact that the State did not ask for any enhancement factors to be applied. Based on the trial court's later statements at the motion for new trial hearing, it is also clear the court was well aware that the Defendant had complied with the terms of his $75,000 bond. At the conclusion of the sentencing hearing, the trial court made extensive findings regarding the troubling facts and circumstances in this case before imposing the sentence of ten years. The court focused on the following facts: (1) the Defendant diverted $8,000 of Erma Alley's money to pay an attorney for the business without informing her; (2) the Defendant treated Erma's money and the money belonging to the other investors as his own; (3) the Defendant only invested

part of Erma's money in the specified investment that he solicited the funds to invest and never informed her of this fact; (4) the Defendant create "web of . . . deceit and deception and misrepresentation" that was established through oral testimony and text message proof; and (5) the Defendant set up a "complicated . . . set of transactions" that involved "knowledge and experience that the average person is not going to have." Ultimately, the trial court found that the Defendant's "manipulation and monetary maneuvering" fit the definition of money laundering. The trial court's detailed findings are more than sufficient to justify the imposition of a ten-year sentence in the Defendant's case.

Second, the Defendant argues that the trial court's application of enhancement factor (6), that the personal injury inflicted was great, and enhancement factor (14), that he abused a position of private or public trust, was error because these factors applied to theft but not money laundering, asserting that in money laundering cases "both parties know the money came from illegal activity." We agree with the State that the Defendant failed to cite any authorities supporting his contention that the trial court erred in applying these enhancement factors to the money laundering conviction. Accordingly, this argument is waived. See Tenn. R. App. P. 27(a)(7) (requiring the appellant to set forth an argument for each of the issue presented, along with "the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). In any case, we are aware of no Tennessee authority that would preclude the trial court from applying enhancement factors (6) and (14) to a money laundering conviction. Cf. State v. Hughes, No. M2017-00057-CCA-R3-CD, 2018 WL 317015, at *2, *4 (Tenn. Crim. App. Jan. 8, 2018) (noting that the trial court applied the abuse of trust enhancement factor where the defendant pled guilty to two counts of theft and six counts of money laundering). Even if the trial court somehow misapplied these enhancement factors, the misapplication of an enhancement or mitigating factor "does not invalidate the sentence imposed unless the trial court wholly departed" from the sentencing act, which is certainly not the case here. See Bise, 380 S.W.3d at 706.

Finally, the Defendant contends that the trial court "used the crime itself that [he] was convicted of as an enhancement factor. At the sentencing hearing, the trial court recognized the sentencing principle that every defendant shall be punished by the imposition of a sentence "justly deserved in relationship to the seriousness of the offense." The trial court then made the following findings concerning Class B felony convictions:

> Well, a Class B felony is about as serious as it gets. There are only two levels above that and that's Class A felony[,] which would be second degree murder or some other various offenses that could be associated with it and then above that would be capital murder, that would be first degree murder which

- 38 -

depending on the facts and circumstances one could be eligible for the death penalty. It's hard to image a situation much more serious than Class B felony.

While the trial court acknowledged the relative seriousness of all Class B felonies, the court's additional findings at the sentencing hearing, detailed above, make it clear that the court believed the money laundering offense committed by the Defendant was particularly serious. The record shows the trial court made sufficient findings to support its conclusion that a sentence of ten years was "justly deserved" by the Defendant based on the gravity of his money laundering offense. Accordingly, the Defendant has not overcome the presumption that his within-range, ten-year sentence was reasonable.

## CONCLUSION

Based on the foregoing, the judgment of the trial court is affirmed.

_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE